Megie *v.* Bennett.

---

OSCAR F. G. MEGIE et al., appellants,

*v.*

ERNEST BENNETT, respondent.

A person bought land which he and the vendor erroneously supposed to extend to a certain point along a lake front. The land was described by building lot numbers upon a map. There was no mistake about the number of lots or their size, but there was a mutual material mistake in respect to one boundary.—*Held*, that under the facts, the grantee could ask for a rescission of the contract; or, having expended money in improving land of the vendor which both mistakenly supposed to be included in the sale, the grantee, upon compensation made for the value of this land, could compel a conveyance.

---

On appeal from a decree in *Bennett* v. *Megie*, advised by Vice-Chancellor Van Fleet, who furnished the following statement of his conclusions:

This case ought to be decided before it will be possible for me to give sufficient time to it to prepare a formal opinion. I shall, therefore, decide it now by giving a brief statement of the rea-

sons which have led my mind to the conclusion that the complainant is entitled to relief. The question on which I think the decision of the case must turn is this: Did the defendant Megie, before the complainant signed the contract of August 23d, 1890, point out to the complainant the boulder, standing near the stake at the end of the line between lots 20 and 21, as the point at or near which the southern line of lot 22, extended to the lake, came?

There is no dispute about the rule which must control the decision of the case. Counsel agree that it is an established rule of equity jurisprudence that if the vendor and vendee go upon the land which is the subject of their negotiations, and the vendor points out to the vendee the boundaries of the land, so that the one sells and the other buys upon a view and practical location of the land, and the conveyance subsequently made, in consequence of either mistake or fraud, embraces more or less land than the vendor pointed out, the injured party has a right to have the conveyance reformed and made to conform to the intentions of the parties.

Up to near the 23d day of August, 1890, all the negotiations of the parties in relation to the land to be sold and purchased, had proceeded on the basis of a printed map, which the defendants had furnished to the complainant. This map exhibited the four exterior lines of lot 22, and that its southern line extended from the Chincopee road to the shore line of the lake on Sunrise bay. The proof shows that prior to the 23d day of August, 1890, the complainant had agreed, verbally, with the defendants Macduff and Tennant, to purchase lot 22 and part of plot B for $1,200, but that such agreement was not regarded by either party as a finality; on the contrary, it appears that it was distinctly understood that what was then said was merely preliminary to the preparation and execution of a formal written agreement, and that neither party should be bound until a written contract had been signed. Before an agreement was written or signed the complainant and the defendant Megie went upon the land, and while there the complainant asked Megie to point out the stake on the shore line between lots 22 and 21. So far there

is no dispute. The object of the complainant's question is apparent—he wanted to know the extent of the water front he would get if he purchased, for in that consisted the chief value of the land; the question, therefore, was one of the most material he could ask.

Megie admits that while he and the complainant were standing on a log lying over the water of the lake, and about three hundred feet distant from the stake standing on the shore line between lots 20 and 21, the complainant asked him where the stake between the lots 21 and 22 was, and also to show it to him, and that they looked across to see if they could see it and talked about it, but he says that he has no recollection of seeing it, and that he feels confident that he could not have told the complainant that he saw it, for the reason that he did not know just where it stood. The complainant, on the contrary, swears positively that Megie told him that he saw the stake and pointed out its location. His description of what occurred while he and Megie were standing on the log is to this effect: He says Megie said that he saw the stake and attempted to show it, but that he could not see it, and that when he told Megie he did not see it Megie directed his attention to a boulder standing on the shore in open view, and said that the stake stood near that boulder.

The proofs show that the boulder which the complainant says Megie pointed out to him stood very near the stake on the shore between lots 20 and 21, and not between lots 21 and 22. That the complainant believed that his purchase extended south to the boulder, embracing what it now turns out is lot 21 as well as lot 22, his own conduct, immediately following his purchase, furnishes very strong evidence. By the contract of August 23d, 1890, the complainant agreed to remove at once, and without delay, all stumps and logs in the lake within the boundaries of the land agreed to be conveyed, and this work, the contract states, was to be done as part of the consideration to be paid for the land. This work was done as soon after the contract was signed as it could be done, and the complainant, in doing it, removed the stumps and logs lying in front of lot 21 as well as those lying in front of lot 22. He also constructed a cribbing

in front of both lots, extending in form of a half circle, from the north line of lot 22 to the boulder, and filled in back of the cribbing on both lots. This filling was completed a month or more before the delivery of the deed, made in execution of the contract of August 23d, 1890. Megie drew that deed, and in drawing it, he made use of the filling as a monument to describe the shore line of the lake. He described the eighth line of the land conveyed in these words : " thence along the same course *across the filling lately made by the party of the second part to* the shore line of the lake in Sunrise bay, *as it exists since said filling.*" Megie does not pretend that in framing this part of the description he was guided by information furnished to him by the complainant, or that when he drew this part of the description he did not know, from personal view and examination, the location, extent and character of the filling which the complainant had made. If he saw the part of the filling which the deed describes, he must also have seen the rest of it—he could not, if he had tried, have so controlled his vision as to have seen only part and not the whole, so that the deed furnishes evidence, well nigh conclusive, that he knew before the delivery of the deed, and also long before the two subsequent contracts were made, that the filling extended far beyond the middle of Sunrise bay, and that is the point which, he says, he thinks he pointed out to the complainant as being about opposite to where the stake between lots 21 and 22 stood.

The conduct of Megie, considered in connection with the complainant's positive affirmation that the boulder was pointed out as a monument, and that Megie evades rather than denies the truth of this statement, has led my mind to the conviction that the parties, in making the contract of August 23d, 1890, dealt on the basis that the boulder stood at or near the southerly boundary of lot 22. And I am also convinced that up to February, 1892, when a survey was made, that Megie believed, just as the complainant did, that lot 22 extended south to the boulder. That this was so, Megie substantially admitted on his cross-examination. Two other lots were sold by him to the complainant after August 23d, 1890, and before the survey was made.

They were sold under lot numbers 21 and 20, but the parcels which the parties had in their minds, and in respect to which they in fact dealt, were lots 20 and 19. While the negotiation for the purchase of the last was in progress, it is undisputed that the complainant and Megie went to the stake on the shore, standing on the line between lots 18 and 19, and that that stake was then pointed out as in the southerly boundary line of the lot which was the subject of their negotiation. The complainant says Megie pointed it out, and Megie says the complainant did. It is unimportant who is right. The importance of the evidence consists in this: That it shows that the parcel of land the one intended to sell and the other intended to buy was lot 19 and not lot 20. Now, Megie admits on cross-examination that up to the time the survey was made, in February, 1892, he supposed that the complainant had purchased all the land lying between the southerly boundary of lot 22 and the southerly boundary of lot 19, and that the defendants held no unsold land between those two points. Except he understood, as the complainant did, that the boulder was on or near the southerly boundary of lot 22, it is impossible for me to see how such a belief could have taken possession of his mind.

The fact is satisfactorily proved that the parties, in making the contract of August 23d, 1890, dealt on the basis that the boulder was on or near the southerly boundary of lot 22. The establishment of this fact entitles the complainant to a reformation of his deed so that it shall convey both lots 22 and 21. This result necessarily entitles the complainant to a conveyance of lots 20 and 19. Though the lots in the contract are called 21 and 20, the evidence makes it clear, beyond question, that the parcels which the one party intended to sell and the other to buy were lots 20 and 19.

I doubt whether the complainant is entitled to costs. If it is desired, I will hear counsel on that question, otherwise the decree will declare that neither party shall recover costs of the other.

*Mr. Ford D. Smith,* for the appellants.

*Mr. Robert H. McCarter,* for the respondent.

The opinion of the court was delivered by

REED, J.

The bill was filed to get a reformation of a certain deed made. by the appellants to the respondent.

The appellants owned Raccoon island, in Lake Hopatcong. Megie was the agent of the appellants to improve the property and sell lots. The island was mapped into lots fronting on a road that runs through the island; the lots, one hundred feet in width, running back to the lake, excepting two tracts at the northeast end of the island. These were mapped as tracts A and B, and were not, on the first map, divided into building lots.

Bennett, the respondent, first agreed to buy a portion of tract B. Before he got his deed he agreed to buy the remaining portion of tract B and the adjoining building lot, mapped as lot number 22. The deeds for these purchases were delivered. It is the second of these deeds which the grantee wishes reformed.

He afterwards bought lot mapped as number 21, lying on the southwesterly side of lot number 20. He finally bought lot number 20, lying to the southeast of lot number 21.

His claim is that when he bargained for the remnant of tract B and lot number 22 he was induced to think that lot number 22 extended along the lake front to a stake near a boulder, which stake in reality marked the southeasterly boundary of lot number 21. He says this stake was pointed out to him by Megie as the boundary of his intended purchase when he and Megie were standing at some distance from the stake.

Mr. Bennett also claims that when he entered into the agreement for lot number 21, Mr. Megie also pointed out a stake as its southwesterly boundary, which stake was actually the southwest boundary of lot number 20, and that when he bought lot number 20 a stake was pointed out which was the boundary of lot number 19. So he thought he was buying lots numbers 21 and 22 when he got his deed for lot number 22 and the remnant of tract B. He thought he was buying lot number 20 when he agreed to buy lot number 21, and that he was getting lot number 19 when he agreed to buy lot number 20.

As to the transaction at the time of the sale of the remnant of tract B and lot number 22, Mr. Megie states that while he and Bennett were together they did look across to see if they could see a stake and talked about it.   He says that he has no recollection of pointing to the boulder as the place where the boundary stake was located.   He denies the statement of Mr. Bennett in respect to his pointing out the stake at the time of the purchase of lot number 21.   He says that he might have been on the line between lots numbers 18 and 19 when he sold lot number 20, but that he did not know the location of the lots.   He says that Bennett said at the time, " That is the stake," and that he, Megie, supposed it was.

It appears that the land was wooded, the stakes obscure and access to them not easy.   The evidence shows that both parties were mistaken as to the location of the mapped lots.   Neither was mistaken as to the quantity of land which was to be conveyed.

The tract B, although not at first laid out into building lots, seems to have been mapped at the time of the execution of the deed for the remnant and lot number 22.   The property is described in this deed as being certain lots, giving their numbers, described on the second map of Raccoon island.   There was no mistake in respect to the fact that the grantee was to get the land as so mapped.   There was no mistake in regard to the size or frontage of these lots.   There was a mistake in respect to the distance to which the frontage of these lots extended westward.

Megie intended to sell the number of lots described.   He did not intend to sell an additional lot.

Bennett intended to buy the lots described in the deed.   He did not intend to buy an additional lot.

Megie was mistaken in regard to the location upon the ground of the southwesterly line of lot number 22.   To speak more accurately, he was mistaken in judging of the distance which the lake frontage of the lots he sold extended.   His mistake led Bennett into a similar error.

The case presents features very similar to those in *Durant* v. *Bacot, 2 Beas. 202; S. C., 2 McCart. 411,* in which case reformation was denied. But Bennett, under the facts here presented, would, on a bill filed for that purpose, have been entitled to a rescission of his contract. *Rowley* v. *Flannelly, 3 Stew. Eq. 612; Pom. Spec. Perf. § 250; Waterm. Spec. Perf. § 366.*

This would entitle him to recover the purchase-money paid. But this result would fail to put him *in statu quo*. He has, under the belief that he was the owner of lot number 19, expended much money in grubbing, filling and reclaiming the ground in front. He was permitted by Megie to do this without warning.

This condition of affairs comes within the control of the equitable doctrine enunciated in the case of *McKelway* v. *Armour, 2 Stock. 115,* and applied in later cases, including *Anglescy* v. *Colgan,. 17 Stew. Eq. 203, 210.*

In the first-named case, a person who had built a house over on the lot of another by mistake, both owners being ignorant of the exact location of the line of division, was permitted to hold as much of the land as was covered by the house, upon making compensation for it.

By the decree in the present case, the complainant gets a deed for lot number 19. He will be permitted to retain his decree upon making compensation for this lot upon which he has made this expenditure of money; otherwise, the decree will be reversed.

The amount which we fix as compensation is $700.

It is admitted, however, that the decree should be amended in respect to the kind of deed which is to be given.

The decree should be so modified.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, DIXON, LIPPINCOTT, REED, VAN SYCKEL, BOGERT, BROWN, CLEMENT, KRUEGER, SMITH—11.

*For affirmance*—None.